IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MARCUS J. HOOKS,<br><br>    Petitioner,<br><br>  vs.<br><br>WARDEN OF AVENAL STATE PRISON,<br><br>    Respondent. | No. C 07-3604 JSW (PR)<br><br>**ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |

## INTRODUCTION

Marcus J. Hooks (hereinafter "Petitioner"), a California state prisoner, filed a petition for a writ of habeas corpus pursuant to 28 U.S.C. § 2254. The petition was initially filed in the United States District Court for the Eastern District of California and was transferred to this Court on July 12, 2007. This Court ordered Respondent to show cause why a writ should not issue. Respondent filed an answer, memorandum and exhibits in support thereof and Petitioner filed a traverse. For the reasons stated below, the petition is denied on the merits.

## PROCEDURAL BACKGROUND

In May 2005, a jury in Santa Clara County Superior Court found Petitioner not guilty of concealing an event affecting the right to an insurance benefit (Cal. Pen. Code § 550(b)(3)) (Count 1). The jury convicted Petitioner of presenting a fraudulent insurance claim (Cal. Pen. Code § 550(a)(1)) (Count 2) and preparing a false insurance claim (Cal. Pen. Code § 550(a)(5)) (Count 3). Petitioner admitted sentence enhancements for prior felony convictions, and for being out of custody on bail on a separate charge of felony insurance fraud. The trial court sentenced

him to a term of ten years in state prison. On appeal, the California Court of Appeal affirmed the conviction and sentence. The California Supreme Court denied his petition for review. He filed the instant federal petition on June 21, 2007.

## FACTUAL BACKGROUND

The facts underlying the charged offenses, as found by the California Court of Appeal, are summarized as follows:

> [T]he evidence established that around 10:30 a.m. on April 15, 2002, defendant was driving his 1988 Acura in the vicinity of the Department of Motor Vehicles on Alma Street in San Jose. The car ahead of him stopped suddenly and the Suburban behind him crashed into the back of his car and pushed it into the car ahead. Defendant's car suffered major rear-end damage and was towed from the scene. The responding police officer cited the driver of the Suburban for driving too fast for conditions. The police report noted that defendant had no liability insurance. Defendant complained of back pain but refused immediate medical assistance.
>
> Late in the afternoon that same day, defendant went to the office of insurance agent John Anjomi and purchased the minimum amount of liability insurance for the Acura. Defendant gave Anjomi certain information necessary for the insurance application forms, including that he worked at UTC in San Jose as a maintenance worker and that he had not had any automobile accidents or driving convictions within the past three years. Defendant and Anjomi signed the application in several places, and defendant paid Anjomi an insurance premium of $35 plus a broker's fee. The insurance policy was effective at the time the information was submitted electronically to the insurance company – at 5:47 p.m. on April 15, 2002. Anjomi printed a temporary insurance identification card for defendant and sent the original application with a check covering the premium to the insurance company. The insurance company then sent a bill to defendant with a higher premium required because defendant in fact had several driving violations on his record and did not qualify for a good driver discount. When no further payment was received, the policy was cancelled effective June 2, 2002.
>
> Harold Morrison was an executive claims specialist with the insurance company for the Suburban driver. After receiving the claim, he determined his company was liable. On April 19, 2002, he took a recorded statement from defendant via telephone. Defendant's car was a total loss and had been towed to Fairgrounds Auto Body. Defendant also claimed damage to the tools in the back of his car. He stated that he was dizzy after the accident, but later felt pain in his "lower lumbar and upper cervical." He was treated by a chiropractor who found bruising and swelling in those regions. Defendant said he worked at United Technology Chemical Systems as an unpaid firefighter intern, he did auto reconstruction at his home, he was a full-time student at Mission College and he worked part time for an emergency medical response unit. Defendant denied having been in any other automobile accidents.
>
> Morrison then telephoned defendant's attorney, Daniel Herns, who told Morrison he was representing defendant only on the bodily injury portion of his

2

claim. Morrison paid defendant directly for his car ($4,149.71) and his damaged tools ($1,696.89).

At some point before Morrison called Herns, defendant had talked to Herns, a civil litigation person injury attorney, about the accident. Herns sent defendant a letter dated April 22, 2002, with a contract for representation to be signed and returned. The letter included authorization forms for medical records and a claim form for lost wages. Although Herns could not remember the precise details of his initial conversation with defendant, he always told prospective clients about allowable damages, including lost wages, as well as noneconomic damages for pain and suffering. Herns routinely explained that to get damages for lost wages, the person would have to be employed and miss time from work. Herns also noted that if a person did not have insurance, he would not take the case because there would be no recovery for noneconomic damages after the passage of Proposition 213. Herns recalled getting the police report at some point and discussing with defendant whether he had insurance coverage the day of the accident. He believed defendant had coverage or he would not have taken his case.

On November 6, 2002, Morrison sent a letter to Herns asking if Herns was still representing defendant because he believed defendant had no insurance at the time of the accident. Morrison requested a copy of defendant's liability policy. He knew that most attorneys do not represent uninsured people in bodily injury claims because of the prohibition on noneconomic damages since the advent of Proposition 213. The police report indicated defendant was not insured at the time of the accident.

Herns recalled discussing this issue with defendant after receiving Morrison's letter. Defendant explained that he had purchased the insurance in the morning on the day of the accident, went back to pay for it later in the afternoon and was insured at the time of the accident. Herns said it did not occur to him to ask defendant about the specific time of day the insurance took effect. At some point, defendant said he did not know he was entitled to damages for pain and suffering. Herns explained the limits of Proposition 213. Herns believed defendant when he said that he was insured at the time of the accident.

On December 30, 2002, Herns sent Morrison a letter stating he would be submitting a demand package. Herns called insurance agent Anjomi's office to request a copy of defendant's insurance policy. He received back a fax of the declaration page showing the policy period as "4-15-02 to 4-15-03." Anjomi reported that in response to Herns' phone call, he faxed back the declarations page as well as the policy application showing the exact time the insurance coverage was effective. Herns denied receiving a copy of the policy application.

Over the course of the next several days, Herns spoke to defendant several times on the telephone to go over the various forms to be submitted as part of the demand package. On January 7, 2003, Morrison received a demand package which included: a demand letter dated January 3, 2003, requesting a total settlement amount of $17,750, a medical report and bill for $5,035.32, a wage loss verification showing total wages unpaid by "Fair Collision Repair" of $3,360, a declaration page from an insurance policy showing a coverage period of "4-15-02 to 4-15-03," a copy of a temporary identification card for insurance coverage and the recorded statement of defendant talking to Morrison. The remaining amount of

3

the claim (approximately $7,500) was for noneconomic damages. Several days earlier, on January 3, 2003, Morrison had written to Herns requesting a certified copy of defendant's automobile insurance policy with the demand package and pointing out that the police report indicated defendant was uninsured at the time of the accident. The letters crossed in the mail.

Morrison then wrote to Herns on January 22, 2003, and offered to settle the claim for special damages of $8,395.32 (medical expenses and wage loss) only, with no offer for noneconomic damages. The letter noted that it was not intended to generate a counter-offer.

Herns was upset and concerned when he received Morrison's offer and called to talk to Morrison about why the claim for noneconomic damages was rejected, because this had not happened to any client before. Morrison explained that his boss agreed with the proposed settlement. Herns called Anjomi to discuss the settlement offer. Anjomi told him that the policy was effective on April 15 about 5 p.m. When Herns called defendant to confront him with this information, defendant admitted that Anjomi was right. Herns then advised defendant that he was lucky to be getting reimbursed for his medical bills and lost wages and that he should accept the offered settlement. Defendant agreed, and the offered amount was paid in settlement to Herns. After paying the medical bill and deducting his costs and fees, Herns sent defendant a check for $528.71.

. . .

At trial, in addition to the primary witnesses discussed above, several other witnesses testified. John Sanchez testified that he owned the business named Fairgrounds Collision Center from 1999 to 2004. He stated that defendant had worked on his own cars on the premises of the business but that he was not an employee and had never been paid wages. His brother Christopher Sanchez who also worked at the Fairgrounds Collision Center testified that even though his name was on the wage loss verification form, he had not signed or ever seen the form.

Defense witnesses included John Anjomi, who testified that many insurance clients lie about their driving records and buy only the minimum insurance. A document examiner testified that she was unable to determine if the signatures on the insurance documents were actually defendant's. An investigator for the district attorney's office testified that Christopher Sanchez told her he did not remember signing the wage loss verification form, but was uncertain if the signature was his. He also said he thought defendant was an employee of his brother's business. According to the investigator, Herns told her that the first time he learned that defendant might not be insured at the time of the accident was on November 6, 2002, when he received Morrison's first letter.

(Resp. Ex. F at 2-6.)

**STANDARD OF REVIEW**

This Court may entertain a petition for a writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a state court only on the ground that he is in custody in

4

1   violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The
2   petition may not be granted with respect to any claim that was adjudicated on the merits in state
3   court unless the state court's adjudication of the claim: "(1) resulted in a decision that was
4   contrary to, or involved an unreasonable application of, clearly established Federal law, as
5   determined by the Supreme Court of the United States; or (2) resulted in a decision that was
6   based on an unreasonable determination of the facts in light of the evidence presented in the
7   State court proceeding." 28 U.S.C. § 2254(d).

8   Under the "contrary to" clause, a federal habeas court may grant the writ if the state court
9   arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or if
10  the state court decides a case differently than the Supreme Court has on a set of materially
11  indistinguishable facts. *Williams v. Taylor,* 529 U.S. 362, 413 (2000). Under the "unreasonable
12  application" clause, a federal habeas court may grant the writ if the state court identifies the
13  correct governing legal principle from the Supreme Court's decision but unreasonably applies
14  that principle to the facts of the prisoner's case. *Id.* As summarized by the Ninth Circuit: "A
15  state court's decision can involve an 'unreasonable application' of federal law if it either 1)
16  correctly identifies the governing rule but then applies it to a new set of facts in a way that is
17  objectively unreasonable, or 2) extends or fails to extend a clearly established legal principle to a
18  new context in a way that is objectively unreasonable." *Van Tran v. Lindsey*, 212 F.3d 1143,
19  1150 (9th Cir. 2000) (citing *Williams*, 529 U.S. at 405-07), *overruled in part on other grounds by*
20  *Lockyer v. Andrade*, 538 U.S. 63 (2003).

21  "[A] federal habeas court may not issue the writ simply because that court concludes in its
22  independent judgment that the relevant state-court decision applied clearly established federal
23  law erroneously or incorrectly. Rather, that application must also be unreasonable." *Williams*,
24  529 U.S. at 411; *accord Middleton v. McNeil*, 541 U.S. 433, 436 (2004) (per curiam) (challenge
25  to state court's application of governing federal law must be not only erroneous, but objectively
26  unreasonable); *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam) ("unreasonable"

5

application of law is not equivalent to "incorrect" application of law).

In deciding whether the state court's decision is contrary to, or an unreasonable application of clearly established federal law, a federal court looks to the decision of the highest state court to address the merits of a petitioner's claim in a reasoned decision. *LaJoie v. Thompson,* 217 F.3d 663, 669 n.7 (9th Cir. 2000).

## DISCUSSION

The petition raises the following grounds for relief: 1) the trial court denied Petitioner his right to present a defense by excluding evidence of insurance industry practices; 2) the court's failure to provide a accurate jury instructions on the Petitioner's defense of "mistake of law" violated the Fifth, Sixth and Fourteenth Amendments; 3) trial counsel was ineffective; and 4) there was cumulative error.

**I.      Right to Present a Defense**

Petitioner claims that the trial court's exclusion of evidence regarding insurance industry practice violated his constitutional rights to present a defense, to call favorable witnesses, and to due process. Petitioner sought to offer the testimony of an insurance litigation attorney, James Roberts, that the practice of attorneys handling automobile accident cases included requesting compensation from insurance companies for noneconomic damages, even though the client might not be eligible for such damages under Proposition 213, because Proposition 213 placed the burden on insurance companies to prove that the claimant was not insured and thus not eligible for such damages. The trial court found that while Roberts qualified as an expert, his testimony was irrelevant.

The Sixth Amendment and the due process guarantee to fundamental fairness afford an accused in a criminal trial the right to present a defense. *Chambers v. Mississippi*, 410 U.S. 284, 294 (1973); *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (citing *California v. Trombetta*, 467 U.S. 479, 485 (1984)). The Supreme Court has made clear that the erroneous exclusion of critical, corroborative defense evidence may violate the Sixth Amendment right to

6

1  present a defense, as well as the due process right to a fair trial.  *DePetris v. Kuykendall*,
2  239 F.3d 1057, 1062 (9th Cir. 2001).  However, "[s]tate and federal rulemakers have broad
3  latitude under the Constitution to establish rules excluding evidence from criminal trials."
4  *Holmes v. South Carolina*, 547 U.S. 319, 324 (2006) (quotations and citations omitted).  The
5  "Constitution permits judges to exclude evidence that is repetitive, only marginally relevant or
6  poses an undue risk of harassment, prejudice or confusion of the issues."  *Id.* at 325-26.

7        Here the California Court of Appeal found that the exclusion of Roberts's proposed
8  testimony did not violate the state evidentiary rules or the Petitioner's constitutional rights to
9  present a defense and due process.  (Resp. Ex. F at 8-12.)  As correctly explained by the state
10 appellate court, Roberts's proposed testimony was not relevant to Count 3, which charged
11 Petitioner with presenting a false insurance claim by falsifying the wage loss claim form,
12 because Roberts's proposed testimony did not concern Petitioner's claim for lost wages.  (*See*
13 *id.* at 9.)  To be sure, Count 2, presenting a fraudulent insurance claim, could have been based
14 on either the wage loss form or on Petitioner's seeking noneconomic damages while not having
15 insurance.[1]  (*See id.*)   Even if it were based on the latter theory, Herns and Morrison had
16 already testified that Proposition 213 required the claimant to have insurance in order to obtain
17 noneconomic damages.  (*See id.* at 10.)  Thus, testimony by Roberts about Proposition 213's
18 requirements would have been duplicative.  Roberts's further proposed testimony as to a
19 general practice among insurance attorneys to seek noneconomic damages without verifying the
20 claimant's insurance had little relevance to this case because Petitioner's insurance attorney,
21 Herns, had presented unrefuted testimony that this was not his practice; he always verified that
22 his client had insurance before seeking noneconomic damages because otherwise Proposition
23 213 foreclosed recovery for such damages.  (*See id.*)  Roberts's testimony as to a general
24 practice in the industry was only marginally relevant where there was uncontradicted evidence

---

[1] The jury was instructed pursuant to CALJIC No. 17.01 that it had to agree on which of the two acts was committed in this count.  (Resp. Ex. F at 9.)

7

as to how the specific attorney practiced in this case. Moreover, unlike Herns, who testified that he explained to the requirements of Proposition 213 to Petitioner, Roberts had no knowledge of Petitioner's state of mind when he submitted his claim for noneconomic damages. (*See id.*)

For the reasons explained by the California Court of Appeal, to the extent Roberts's proposed testimony was cumulative, and to the extent it was not cumulative, it had minimal, if any, relevance. Therefore, excluding the evidence did not violate Petitioner's constitutional rights to present a defense via favorable witnesses or to a fundamentally fair trial guaranteed by due process. *See Montana v. Egelhoff*, 518 U.S. 37, 42 (1996) (holding that due process does not guarantee a defendant the right to present all evidence, regardless of how marginal its relevance). Accordingly, the state courts' denial of this claim was neither contrary to nor an unreasonable application of federal law.

## II.   Jury Instructions

Petitioner claims that the trial court violated his constitutional rights to due process and to a jury trial by failing to provide instructions to the jury, *sua sponte,* that his "mistake of law" negated the specific intent required for his conviction on Counts 2 and 3. He argues that such an instruction was necessary for him to advance his defense that he did not have the specific intent to defraud when he sought noneconomic damages despite not having insurance because he did not know that Proposition 213's required that he have insurance in order to obtain such damages.

Due process requires that "'criminal defendants be afforded a meaningful opportunity to present a complete defense.'" *Clark v. Brown*, 450 F.3d 898, 904 (9th Cir. 2006) (quoting *California v. Trombetta*, 467 U.S. 479, 485 (1984)). Therefore, a criminal defendant is entitled to adequate instructions on the defense theory of the case. *Conde v. Henry*, 198 F.3d 734, 739 (9th Cir. 2000). Due process does not require that an instruction be given, however, unless the evidence supports it. *Hopper v. Evans*, 456 U.S. 605, 611 (1982); *Menendez v. Terhune*, 422 F.3d 1012, 1029 (9th Cir. 2005). A defendant is entitled to an instruction on his defense theory

8

only "if the theory is legally cognizable and there is evidence upon which the jury could rationally find for the defendant." *United States v. Boulware*, 558 F.3d 971, 974 (9th Cir. 2009).

To begin with, it was Petitioner's false and fraudulent claim for lost wages, not his claim for noneconomic damages, that was the basis of the charge in Count 3 and that was one of two alternative theories for the charge in Count 2. Petitioner's purported mistake of law regarding Proposition 213's requirement regarding noneconomic damages would not negate his specific intent in falsely and fraudulently submitting the claim for lost wages.

Furthermore, even if the conviction on Count 2 was based on the fraudulent claim for noneconomic damages, there was no need for a mistake of law instructions because there was no evidence that Petitioner did not know about the legal requirements of Proposition 213 when he submitted the claim. Petitioner did not testify, so there was no testimony from him that did not know what Proposition 213 required. Moreover, Petitioner's attorney testified that, while he did not recall specifically the conversations he had with Petitioner, he always informed his clients, and would have done so with Petitioner, that if they want to recover noneconomic damages, they were required under Proposition 213 to be insured at the time of the accident. Herns further testified that Petitioner informed him, falsely, that he did have insurance at the time of the accident. Finally, even if Roberts had been allowed to testify, his proposed testimony was about general practices in the industry; Roberts had no knowledge of, and could not testify to, Petitioner's state of mind when he sought noneconomic damages. In the absence of any evidence that Petitioner did not know about Proposition 213's requirement, there was no evidence to support instructions that his "mistake of law" negated his specific intent. Consequently, the state courts correctly concluded that the failure of the trial court to issue such an instruction sua sponte did not violate Petitioner's constitutional rights to present a defense and to due process.

For the same reasons, the absence of such instructions was not prejudicial. A habeas petitioner is not entitled to relief unless the trial error had a substantial and injurious effect or

9

influence in determining the jury's verdict. *Brecht v. Abrahamson*, 507 U.S. 619, 637 (1993). As there was no evidence indicating Petitioner was ignorant of Proposition 213, and indeed the only evidence indicated otherwise, the jury had no basis for finding that Petitioner made a "mistake of law." As a result, the lack of instructions regarding Petitioner's "mistake of law" defense did not have a substantial and injurious effect on the outcome of the case.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### III.  Ineffective Assistance of Counsel

Petitioner claims that trial counsel was ineffective in failing to argue that excluding Roberts as a witness violated his constitutional rights to present a defense and due process, and in failing to argue for instructions on his "mistake of law" defense.

A petitioner seeking to advance a claim of ineffective assistance of counsel must show that his counsel's representation fell below an objective standard of reasonableness, and that counsel's errors were prejudicial insofar as there is a reasonable probability that, but for the errors the outcome of the trial would have been different. *Strickland v. Washington*, 466 U.S. 668, 687 (1984).

For the reasons described above, the exclusion of Roberts's proposed testimony, which was cumulative and minimally relevant, did not violate Petitioner's constitutional rights to present a defense and to due process. Similarly, as discussed above, instructions on Petitioner's "mistake of law" defense were not appropriate because there was no evidence in support of such a defense. Trial counsel cannot have been ineffective for failing to make a meritless argument or motion. *See Juan H. v. Allen*, 408 F.3d 1262, 1273 (9th Cir. 2005). Counsel's failure to advance a meritless constitutional argument regarding Roberts's testimony and his failure to make a meritless request for instructions regarding Petitioner's "mistake of law" defense did not amount to ineffective assistance of counsel.

Accordingly, Petitioner is not entitled to habeas relief on this claim.

### IV.  Cumulative Error

10

Petitioner claims that the foregoing errors considered cumulatively warrant relief. In some cases, although no single trial error is sufficiently prejudicial to warrant reversal, the cumulative effect of several errors may still prejudice a defendant so much that his conviction must be overturned. *Alcala v. Woodford*, 334 F.3d 862, 893-95 (9th Cir. 2003). Where there is no single constitutional error existing, nothing can accumulate to the level of a constitutional violation. *Mancuso v. Olivarez*, 292 F.3d 939, 957 (9th Cir. 2002). Because there was no constitutional error found in the preceding claims, there is no cumulative error warranting relief.

Petitioner is not entitled to habeas relief on this claim.

## CONCLUSION

For the foregoing reasons, the petition for a writ of habeas corpus is DENIED. The Clerk shall enter judgment for Respondent and close the file.

IT IS SO ORDERED.

DATED: July 21, 2009

<u>/s/ Jeffrey S. White</u>
JEFFREY S. WHITE
United States District Judge

| | |
|---|---|
| MARCUS J. HOOKS,<br><br>            Plaintiff,<br><br>    v.<br><br>WARDEN OF AVENAL STATE PRISON et al,<br><br>            Defendant.                              / | Case Number: CV07-03604 JSW<br><br>**CERTIFICATE OF SERVICE** |

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Northern District of California.

That on July 21, 2009, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, or by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office.

Marcus J. Hooks
P.O. Box 9
T89927
Avenal, CA 93204

Dated: July 21, 2009

*Jennifer Ottolini*
Richard W. Wieking, Clerk
By: Jennifer Ottolini, Deputy Clerk